IN THE UNITED STATES DISTRICT COURT
FOR THE WESETERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAUREN PREVAC, an Ohio Citizen,
JANNETTE PREVAC, an Ohio Citizen
and FRANK PREVAC, an Ohio Citizen,,

        Plaintiff,

v.

NARCONON FREEDOM CENTER;
ASSOCIATIOIN FOR BETTER LIVING AND
EDUCATION INTERNATIONAL; NARCONON
EASTERN UNITIED STATES; NARCONON
INTERNATIONALL and DOES 1-100, ROE
Corporations I-X, inclusive,

        Defendants.

Case No. 15-CV-00037-RJJ

Hon. Robert J. Jonker

---

| | |
|---|---|
| Jeffrey P. Ray           (P31098)<br>JEFFREY P. RAY, P.C.<br>Attorney for Plaintiffs<br>2500 Lake Lansing Road, Suite A<br>Lansing, MI  48912<br>517-372-5700<br>jeff@otisraylaw.com | Kathleen H. Klaus      (P67207)<br>MADDIN HAUSER, ROTH &<br>  HELLER, P.C.<br>Attorneys for Narconon Freedom Center,<br>Association for Better Living and Education<br>International and Narconon International<br>28400 Northwestern Highway, 3rd Floor<br>Southfield, MI  48034<br>(248) 359-7520<br>kklaus@maddinhauser.com |

## PLAINTIFFS LAUREN PREVEC, JANNETTE PREVEC AND FRANK PREVEC'S

## FIRST AMENDED COMPLAINT

Plaintiffs Lauren Prevec, Jannette Prevec and Frank Prevec ("Plaintiffs"), through counsel, JEFFREY P. RAY, P.C., allege the following:

1

# I.

# PARTIES

1. Plaintiffs Lauren Prevec, Jannette Prevec, and Frank Prevec were, and at all relevant times to this Complaint, are residents of Ohio.

2. Defendant Narconon Freedom Center, Inc. (hereafter "NFC"), is, and at all times relevant to this Complaint was, a corporation incorporated under the laws of, and with its principal place of business in, the State of Michigan. NFC has been at all relevant times transacting business in Albion, Michigan.

3. Defendant Narconon International ("NI") is a California corporation with its headquarters in Los Angeles, California.

4. NI is the principal and licensor of Defendant NFC. NI exercises control over the time, manner, and method of NFC's operations. NI also licenses the standardized treatment program that NFC uses, the Narconon Program, to NFC.

5. NI was doing business in the State of Michigan by and through its agent and licensee Defendant NFC.

6. NFC and NI are agents of the Association for Better Living and Education ("ABLE"). ABLE oversees the drug rehabilitation, education, and criminal justice activities of the Church of Scientology including, but not limited to, NFC and NI.

7. Defendant ABLE is a corporation registered in the State of California with its headquarters in Los Angeles, California.

8. ABLE controls the time, manner, and method of NI's and NFC's businesses by actively managing their daily operations, including conducting inspections of Narconon centers and creating, licensing, and approving their marketing materials.

9. ABLE transacts business in the State of Michigan by and through its agents, Narconon International and Narconon Freedom Center.

10. Defendant Narconon Eastern United States ("Eastern") is a corporation registered in the State of Virginia with its headquarters in Clearwater, Florida.

11. Eastern controls the time, manner, and method of NFC's business by actively managing its daily operations, and creating and approving their marketing materials.

12. Eastern transacts business in the state of Michigan through its agent, NFC.

13. Plaintiffs are unaware of the true names and capacities, whether individual, corporate, associate, or otherwise, of Defendant DOES 1-100, inclusive, and, therefore, sues these Defendants by fictitious names. Plaintiffs will seek leave of this Court to amend this Complaint when the identities of these Defendants are ascertained.

## II.

## JURISDICTION AND VENUE

14. This Court has subject jurisdiction pursuant to 28 U.S.C. § 1332. The amount in controversy exceeds $75,000.00, and there is complete diversity between the parties.

15. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial portion of the events and omissions giving rise to this lawsuit occurred in this District, and the Court has personal jurisdiction over each of the parties as alleged throughout this Complaint.

## III.

## FACTUAL ALLEGATIONS

14. On or about May 15, 2012, Plaintiff Jannette Prevec was looking for a drug rehabilitation facility for her daughter, Plaintiff Lauren Prevec.

15. Jannette found Defendant NFC's website through the Internet, which claimed to have a 70% "success rate," and contacted NFC.

3

16.   Jannette spoke with NFC intake counselor Donald Michalski and explained that she was seeking substance abuse treatment for her daughter.

17.   Michalski informed Jannette that the Narconon program NFC uses had 70 percent "success rate."

18.   Michalski informed Jannette that NFC had a AAA rating with the Better Business Bureau.

19.   Michalski informed Jannette that NFC charged an upfront fee of $25,000.00.

20.   Michalski obtained Jannette's insurance information and told Jannette that he had checked on her insurance coverage and that her insurance would reimburse the entire cost of the program at NFC.

21.   Michalski pressured Jannette to take out credit cards to pay NFC's upfront fee, telling her that she could pay off the cards with the insurance reimbursement.

22.   On or about May 18, 2012, Jannette drove Lauren to NFC's facility in Albion, Michigan.

23.   On arriving at the facility, Plaintiffs met Michalski.

24.   Plaintiffs noticed L. Ron Hubbard books at the facility and asked Michalski whether the treatment at NFC involved Scientology.

25.   Michalski told Plaintiffs that the treatment program at NFC had nothing to do with Scientology.

26.   Plaintiffs paid NFC $25,000.00 for drug rehabilitation in two payments.

27.   On or about May 21, 2012, Michalski called Jannette to tell her he had learned Jannette's insurance would cover the entire cost of the program.

28.   When Lauren entered treatment at NFC, she was placed into the 5-day "detox" portion f the program.

29.   The detox portion of the program was merely a separate area from the rest of the treatment program at NFC. Lauren did not see a doctor nor receive a full medical assessment.

30. During the detox portion, NFC took Lauren completely off of her anti-depressant medication.

31. NFC had Lauren undergo the Narconon treatment program as a means of drug treatment.

32. Each patient undergoing the Narconon program receives the same eight course books based on the works of L. Ron Hubbard, founder of the Scientology religion.

33. The materials in the course books are L. Ron Hubbard technology. In Narconon and Scientology, L. Ron Hubbard technology is to be applied *exactly* as written. Accordingly, patients undergoing the Narconon program are not allowed to go beyond or deviate from the "technology" in the Narconon course books.

34. The materials in the eight Narconon course books come directly from Scientology's scriptures.

35. The Narconon course books teach foundational Scientology concepts and doctrines such as the Eight Dynamics of Existence, the Cycle of Communication, the Conditions of Existence, the Suppressive Person doctrine, Overts and Withholds, the A-R-C triangle, and "clearing" words and study "tech."

36. The Narconon course books have patients demonstrate their understanding of Scientology doctrines by, for example, making clay sculptures related to those doctrines.

37. The Narconon program has a sauna and vitamin component known as the New Life Detoxification Program.

38. Narconon's sauna program, the New Life Detoxification Program, is actually a Scientology ritual known as the "Purification Rundown."

39. Completion of the Purification Rundown is a required ritual for practicing Scientologists in order to move up "The Bridge To Total Freedom," Scientology's spiritual journey.

40. NFC had Lauren undergo the Narconon sauna program that Narconon calls the "New Life Detoxification" program.

5

41.     The "New Life Detoxification" program is identical to the Scientology ritual known as "Purification Rundown," or the "Purif." The Purification Rundown is a required component of Scientology training and is part of Scientology's "Bridge to Total Freedom."

42.     Narconon's rationale for the sauna program is that residue of many different types of drug remain in the body's fatty tissue long after use. The drug residue is released from the fatty tissue from time-to-time into the bloodstream causing the individual to crave the drug, and, ultimately, relapse.

43.     NFC represented to Lauren that its sauna program would flush residual drug toxins out of her system and thereby reduce or eliminate the drug cravings the residue causes.

44.     Under the New Life Detoxification program, students first exercise vigorously before entering the sauna each day. On entering the sauna, Narconon requires each student to ingest increasing doses of Niacin and a "vitamin bomb."

45.     The New Life Detoxification Program requires students to spend up to five hours per day for five weeks in a sauna at temperatures between 160 and 180 degrees Fahrenheit.

46.     NFC had Lauren ingest doses of up to 5,000 milligrams of Niacin per day under the New Life Detoxification Program.

47.     There were no medical personnel overseeing Lauren while she was undergoing the sauna program.

48.     All Defendants' claims about the benefits of the Narconon sauna program, *i.e.*, Scientology's Purification Rundown, are false and do not withstand scientific scrutiny.

49.     In a prior lawsuit, Dr. Louis A. Casal, an expert retained by Narconon International and Narconon of Northern Georgia in a wrongful death suit filed against those entities, testified at a deposition. Relevant portions of Dr. Casal's deposition testimony are attached hereto as **Exhibit G**. When asked under oath about the New Life Detoxification Program, he testified that there is no

scientific basis for the notion that sweating in a sauna detoxifies a person's body or treats addiction:

> Q.   Have you looked at the Narconon literature on what Narconon contends the benefits from the sauna are?
>
> A. [Dr. Casal] Yes, I have.
>
> Q.   And the sauna program, what Narconon contends is that in – it in fact detoxifies your body. True?
>
> A.   True.
>
> Q.   But there's no scientific basis that you can point to support that contention, is there, sir?
>
> A.   You're correct.
>
> Q.   So when Narconon states that the sauna program detoxifies its students, you're not aware, as a medical doctor, of any scientific basis for that contention?
>
> A.   I agree.

**Exhibit G**, Deposition of Dr. Louis Casal, 136:21 – 137:9.

50. Just as Michalski did to Jannette, Defendants routinely advertise that the Narconon program has a more than 70% success rate despite knowing this is false.

51. NI claims a success rate of 70% for all Narconon centers. NI has published no studies or other verifiable evidence to support their claimed success rates.

52. NI and ABLE direct individual Narconon centers such as NFC to advertise that their treatment programs have at least a 70% success rate. NI and ABLE know full well that there is no evidence to back up this claim.

53. Dr. Casal, the medical expert retained by Narconon International in another lawsuit, testified atherdeposition that he was not convinced Narconon's claimed success rate was true:

> Q. Okay. What are you relying on – well, let me ask you this; do you believe that 76 percent success ratio is accurate?
>
> A. [Dr. Casal].  Mr. Harris, I'll be honest with you, that's a big number.
>
> Q. Yeah, it's – it's a real big number.
>
> A. It's a big number.
>
> Q. And it's completely inconsistent –
>
> A. I – I hope it's true, but, I mean, I would need some convincing.
>
> …
>
> Q. Okay. Do you have any idea where Narconon is getting the numbers that it's using?
>
> A. You know, in the interest of time – I just didn't have enough time to delve deeper into those studies, Mr. Harris. And I – I would be happy to, but, no, I don't have a clear understanding of where that 70 – 70-something number came from, no, sir.

**Exhibit G**, Deposition of Dr. Louis Casal, 124:21 – 125:5; 126:1 – 7.

54. Defendants are well aware that there is no basis for the claimed success rate of the Narconon program. Nevertheless, NFC claimed an over 70% success rate for the Narconon program to Plaintiff to induce her to admit herself to NFC for treatment.

55. For example, the Director of Legal Affairs for Narconon International, Claudia Arcabascio, advised the Narconon Freedom Center in Michigan not to claim the high success rate in responding to a Better Business Bureau complaint. Ms. Arcabascio advised Narconon Freedom "do not say we have 70% success (we do not have scientific evidence of it)." *See* email from Ms. Arcabascio, attached hereto as **Exhibit A.**

56. During Lauren's time at NFC she observed NFC staff members engage in romantic relationships with patients.

57. During Lauren's time at NFC drugs were regularly brought into the facility.

58.     Narconon documents indicate that the Narconon program is used to recruit patients into the Church of Scientology. For example, a Narconon document titled the "Narconon Technical Line-Up" provides a flow chart of a patient's experience into and through the Narconon program. The document shows that when a patient finishes the Narconon program, the patient is to be "route[d] to the nearest Org for further services if the individual so desires." "Org" is Scientology jargon for an individual church providing services for the Church of Scientology. A copy of the "Narconon Technical Line-Up" is attached hereto as **Exhibit B**.

59.     Narconon considers its program to be the "Bridge to the Bridge." That is, Narconon considers its program to be an initial step into getting on Scientology's "Bridge to Total Freedom," the key spiritual journey that practitioners of the Scientology religion undertake. *See, e.g.,* "Narconon News, 1974, Volume 6, Issue 3: Narconon Is The Bridge to The Bridge," attached hereto as **Exhibit C**.

60.     Other Narconon centers display tokens of recognition they have received for introducing patients to Scientology through the Narconon program. At Narconon Fresh Start's headquarters in Glendale, California, hangs a plaque from the Church of Scientology that thanks Larry Trahant, Executive Director of Narconon Fresh Start, and "The Narconon Freedom Center Team" for introducing patients to L. Ron Hubbard and "The Bridge." The writing on the plaque provides, in relevant part:

> Larry and his dynamic team at Narconon Freedom Center are hereby
> warmly thanked and highly commended for their dedication and
> hard work. They give us tremendous back up in introducing LRH to
> the world and are saving lives on a daily basis. There are thousands
> of beings who have taken their first steps on The Bridge, thanks to
> the compassion and efforts of this team.

A photo of this plaque is attached hereto as **Exhibit D**.

61.     Scientology publications show that the Narconon program is part of Scientology's plan to "clear" the planet. (To "go clear" is the ultimate spiritual goal for a Scientologist, achieved after

9

one goes up the "Bridge to Total Freedom.") The document attached hereto as **Exhibit E**, shows a Church of Scientology, or an "Org" as it's known, with an arrow directed at the Narconon "Jumping Man" logo. The document reads:

> The question is not how to clear an individual, it's how to clear a civilization ... by making every one of our orgs a central organization responsible for every sector of Scientology activities across it's [sic] entire geographic zone.

In other words, the Church of Scientology is supposed to direct Narconon to achieve Scientology's spiritual goal of "clearing" the planet.

62.  NFC is using the Narconon program to introduce Scientology and L. Ron Hubbard's "technology" to unwitting patients seeking drug rehabilitation. This is exactly as the Church of Scientology directed as part of its "Social Coordination Strategy." Scientology explicitly outlined this strategy in an urgent Executive Directive from the Authorization, Verification, and Correction Department of its Religious Technology Center. The Executive Directive outlining the "Social Coordination Strategy" is attached hereto as **Exhibit F** (hereafter the "SOCO Directive").

63.  The SOCO Directive instructed all SOCO GROUPS, which includes Narconon, as follows:

> YOU ARE THERE TO SELL LRH's TECH TO THE SOCIETY
> AND GET IT USED, AS THE TECH. You do this through a
> SMOOTH JOB OF PROMTIONAL ORGANIZATION – FRONT
> GROUPS, CORPORATIONS, FIELD WORKERS, ETC.
> (emphases in original).

The SOCO Directive expressly directed the use of front groups to introduce L. Ron Hubbard's "technology," *i.e.*, Scientology, to society.

64.  On or about July 3, 2012, Plaintiff was suspended from NFC because she tested positive for marijuana.

65. Plaintiff did not return to the facility because the treatment at NFC bore no resemblance to what Plaintiffs had been promised.

66. Plaintiff's insurance reimbursed her for $16,624.60 for the services rendered to her at NFC, and her insurance was billed as "intensive outpatient," despite her inpatient status during her time at NFC.

67. Plaintiff's remaining $8,357.40 balance was paid by Plaintiff and not reimbursed by Plaintiff's insurance, contrary to statements made by NFC.

68. At NFC, Lauren did not receive any of the treatment Plaintiffs had been promised and for which Plaintiffs paid a substantial sum of money. Instead, Lauren received only Scientology indoctrination.

## RELATIONSHIP AMONG DEFENDANTS

69. Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

70. ABLE, NI and Eastern heavily influence NFC and govern and control nearly every aspect of Narconon Freedom Center's business activities.

71. NI publishes operations manuals and requires that individual Narconon centers such as Narconon Freedom Center abide by these manuals in their operations. These operations manuals are called "Running An Effective Narconon Center" and "Opening A Successful Narconon Center."

72. These manuals show that NI, ABLE, and Eastern have the ultimate authority over Narconon Freedom Center employees. Narconon Freedom Center cannot demote, transfer, or dismiss a permanent staff member at Narconon Freedom Center without approval from the Senior Director of Administration at NI.

73. NI, ABLE and Eastern have the ultimate authority over the hiring of staff members at Narconon Freedom Center. If a Narconon Freedom Center staff member does not meet the

qualifications of a staff member, the staff member may petition the Senior Director of Administration at NI to remain on staff.

74. If a staff member at Narconon Freedom Center believes she has been given orders or denied materials that make it hard or impossible for her to do her job, she may file a "Job Endangerment Chit" with the Ethics Department at NI. NI and Eastern then investigate and works to resolve the staff member's issue.

75. The operations manuals require staff members at Narconon Freedom Center to report misconduct and "nonoptimum conduct' to the Quality Control Supervisor at NI. NI and Eastern investigate misconduct at Narconon Freedom Center and may take disciplinary actions against its staff members.

76. NI and Eastern receive ten (10%) percent of the weekly gross income from Narconon Freedom Center.

77. NI requires Narconon Freedom Center to send it detailed weekly reports containing statistics of more than 40 different metrics. NI and Eastern review these weekly reports and order changes at Narconon Freedom Center based on increases or decreases in the statistics in the reports.

78. NI, Eastern, and ABLE require that Narconon Freedom Center receive approval on all promotional materials before NFC disseminates them. Further, NFC must obtain approval as to its Internet websites from NI, Eastern, and ABLE before the sites "go live."

79. NI, Eastern, and ABLE also assist in creating Narconon Freedom Center's advertising materials. NI, Eastern, and ABLE dictate the contents of those advertising materials.

80. NI requires that Narconon Freedom Center maintain a "building account fund" in which weekly monies from the gross income are used to purchase new premises and also as a cushion to salvage the organization in dire circumstances. The "building fund" is under the control of NI.

81. NI, Eastern, and ABLE conduct "tech inspections" at Narconon Freedom Center. These inspections entail NI, Eastern, and ABLE monitoring and correcting the manner in which Narconon Freedom Center delivers the Narconon treatment program to patients at NFC. NI, Eastern, and ABLE instruct staff at NFC as to the exact manner in which they are to perform their services and deliver the Narconon treatment program.

82. NI and ABLE also publish all training materials for Narconon Freedom Center.

83. This includes seven different training materials on subjects ranging from the Narconon sauna program to overseeing to delivering the Narconon treatment program.

84. NI, Eastern, and ABLE micro-manage individual Narconon centers such as NFC to such a large extent that they publish the exact materials authorized to be sold in an individual Narconon center's bookstore.

85. Further, the NI Director of Technology and Approval demands and ensures that there are good photos of L. Ron Hubbard visible in every center and that materials are available to students and staff as to L. Ron Hubbard's contributions in the field of alcohol and drug rehabilitation.

86. NI, Eastern, and ABLE work with individual Narconon centers such as NFC on legal problems, including patient requests for refunds and complaints to the Better Business Bureau. In addition, NI, Eastern, and ABLE work to combat negative publicity for NFC.

87. NI, Eastern, and ABLE are intimately involved in the day-to-day operations of Narconon Freedom Center. NI, Eastern, and ABLE have the final authority over all decisions at Narconon Freedom Center relating to hiring and firing, delivery of services, finances, advertising, training, and general operations.

88. NI, Eastern, and ABLE use the Narconon program to recruit for and promote the Scientology religion under the guise of providing drug rehabilitation.

89. NI, Eastern, and ABLE all are principals served by their agent, NFC.

## FIRST CLAIM FOR RELIEF (AS TO ALL DEFENDANTS)

## CIVIL RICO FOR MAIL AND WIRE FRAUD, 18 U.S.C. § 1964(c)

90. Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

91. Plaintiff has been injured by Defendants' conduct of an enterprise through a pattern of racketeering activity.

92. Defendants have engaged in a scheme to defraud Plaintiff and countless others. In furtherance of that scheme, Defendants have committed countless acts of mail fraud and wire fraud under 18 U.S.C. § 1962 within the preceding ten years.

93. Defendants perpetrate this scheme as follows: Defendants set up numerous websites purporting to be either websites for treatment programs or websites for independent referral services for drug treatment programs.

94. As with NFC's many websites, including www.narcononfreedomcenter.org, these websites conceal the fact that they are connected with the Church of Scientology. The websites also conceal the fact that the entire Narconon Program is comprised of Scientology doctrines and scriptures.

95. As with NFC's many websites, www.narcononfreedomcenter.org, the websites advertise a drug rehab program – the Narconon program (whether or not the site expressly refers to the Narconon name) – and falsely claim the following: (a) that the drug rehab program has a 70% "success rate" or more; (b) that the drug rehab program has a sauna program that has been scientifically shown to reduce or eliminate an addict's drug cravings; (c) that the program is secular and does not involve the study or practice of religion; and (d) that the program involves individualized treatment and extensive counseling when, in fact, each patient undergoes the same sauna treatment and receives the same L. Ron Hubbard books.

96. When a prospective patient or their loved one calls the number on one of the websites, they speak to an intake specialist. The intake specialist, directed by Narconon, makes a host of false

14

claims to induce the patient to admit himself the Narconon facility such as the false claims Donald Machalski made to Plaintiff on May 15, 2012.

97. These false claims include: (i) that Narconon Program has a more than 70% success rate; (ii) that Narconon's sauna program reduces or eliminates drug cravings by eliminating toxins from an addict's fatty tissue; (iii) that patients at Narconon will receive extensive drug counseling; (iv) that the Narconon program does not involve any religion; and (v) that patients at Narconon will be under the supervision of licensed physicians and other medical personnel.

98. Defendants also mail prospective clients such as Plaintiff pamphlets making these same false claims to induce them to enter into the program.

99. Defendants often recruit prospective clients from different states in which the facility is located. For that reason, Defendants' use of the phones, wires, mail, and Internet is integral to their fraudulent scheme.

100. While a patient is undergoing the program, Defendants prepare the patient to become a Narconon staff member following the patient's completion of the program. In doing so, the patient becomes a counselor for the next wave of incoming patients. This scheme allows Defendants to pay a patient-turned-counselor low wages and Defendants are spared the relatively higher cost of paying duly qualified addiction counselors.

101. As a patient-turned-counselor, the person is further indoctrinated in Scientology and advances in the Narconon organization by taking Scientology courses and services.

102. Defendants use the Narconon treatment program as a recruiting tool for the Church of Scientology, as evidenced by Defendants' own documents, attached hereto as Exhibits C through F.

103. That the above predicate acts constitute a pattern of racketeering activity, conducted by Defendants as an enterprise.

104. As a result of Defendants' use of the mails and wires in furtherance of their enterprise and scheme to defraud Plaintiff, Plaintiff was defrauded of the $8,357.40 she paid Defendants. Plaintiff, therefore, has been "injured in [her] business or property by reason of a violation of section 1962 ...." 18 U.S.C. § 1964(c).

105. Plaintiff is therefore entitled to recover threefold or treble damages in the amount of $45,000.00, or whatever they are found to be entitled to as damages, costs of suit, and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF

## BREACH OF CONTRACT

106. Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows:

107. Plaintiffs and Defendants were bound by a Contract whereby Defendant agreed, in exchange for consideration, to provide secular, residential drug and alcohol treatment to Lauren Prevec.

108. Defendants breached this contract by, *inter alia*: (i) failing to provide services constituting drug and alcohol treatment; and (ii) providing Scientology in lieu of drug and alcohol treatment.

109. Defendants' breaches have caused Plaintiffs to suffer damages in excess of $75,000.00.

## THIRD CLAIM FOR RELIEF

## FRAUD

110. Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows:

111. On or about May 15, 2012, Donald Michalski, acting within the scope of his employment at NFC, made the following knowingly false statements to Plaintiffs: (i) that the Narconon program has a 70 % "success rate;" and (ii) that NFC had a AAA rating with the Better Business

Bureau (iii) that the Narconon program had nothing to do with Scientology, and (iv) that insurance would reimburse Plaintiff 100% for her payment.

112.   Had Plaintiff Jannette Prevec known these representations were false she would not have admitted her daughter to NFC for treatment nor paid Defendants a substantial sum of money.

113.   Plaintiffs justifiably relied on these false statements.

114.   As a proximate result of Defendants' fraudulent conduct, Plaintiffs have suffered damages in excess of $75,000.00.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for the following relief:

A. Judgment in favor of Plaintiffs and against Defendants for damages in such amounts as may be proven at trial;

B. Compensation for special, general, and treble damages;

C. Reasonable attorney's fees and costs of suit;

D. Interest at the statutory rate;

E. Punitive or exemplary damages against Defendants; and

F. Injunctive relief prohibiting Defendants from further engaging in deceptive trade practices.

DATED: March 27, 2015

/s/ Jeffrey P. Ray
Jeffrey P. Ray (P31098)
Attorney for Plaintiffs
JEFFREY P. RAY, P.C.
2500 Lake Lansing Road, Suite A
Lansing, MI 48912
(517) 372-5700
jeff@otisraylaw.com